UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY CURRY, | ) | CASE NO. 4:09cv614 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| DAVID BOBBY, et al., | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | [Resolving Doc. 16] |
| | ) | |
| | ) | |

This matter comes before the court on Defendants' Motion for Partial Summary Judgment on Plaintiff's claim that he should be permitted to grow uncut dreadlocks while in custody at the Ohio State Penitentiary. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

**I. Background**

Plaintiff *pro se* Gregory Curry ("Plaintiff") is a prisoner in the custody of the Ohio Department of Rehabilitation and Correction ("ODRC"), incarcerated for numerous felonies including aggravated murder.[1] At the time of his murder conviction, Plaintiff was an inmate at Southern Ohio Correctional Facility in Lucasville, Ohio. During the deadly Lucasville riot in 1993, Plaintiff along with other inmates dragged another inmate out of his cell and beat him to death with shovels, weight bars and bats, and attempted to kill a second inmate in a similar fashion. Plaintiff has been placed in the Ohio State Penitentiary ("OSP") in Youngstown, Ohio, a maximum security prison that houses Ohio's most violent offenders, and he is classified as a Level 4 maximum security inmate. In addition to his criminal convictions, Plaintiff has a

---

[1] In total, Plaintiff is serving a prison sentence for eight felony convictions including attempted aggravated murder, aggravated robbery, and assault.

lengthy record of institutional offenses, including threatening other inmates, destruction of property, possession of contraband, attempting to convey drugs, and assaulting officers and inmates. *See* Doc. 16-3. Most of these offenses occurred between 1994 and 1997.

Plaintiff identifies himself as an adherent to the Rastafarian religion. He asserts that, in 2006, he was granted an approval/accommodation of religious practice allowing accommodations specified by ODRC policy. Plaintiff subsequently filed a grievance on July 19, 2006, to receive an exemption beyond the policy's provisions to grow dreadlocks and to receive a natural food diet. The Inspector of Institutional Services (whose name is unclear from the record) granted Plaintiff an exemption to grow uncut dreadlocks in compliance with the grooming policy, "meaning they will not be omitted from being searched at random and may not be grown longer than three inches." (Doc. 3-3 Exh. C).

According to Defendant Gary Sims ("Rev. Sims") ODRC Religious Services Administrator, on April 17, 2008, Plaintiff applied for religious accommodations to grow his hair in *uncut* dreadlocks and to be provided with an all-natural vegetarian diet with no processed foods. Although his institutional chaplain recommended that both requests be approved, an OSP committee recommended that dreadlocks be disapproved and that braids be allowed instead. Defendant David Bobby ("Warden Bobby") is the warden of OSP, and denied the accommodation for dreadlocks but allowed Plaintiff to wear his hair in braids of any length. Plaintiff's dietary request was also denied because OSP already offered vegetarian diet options. On administrative appeal, Rev. Sims affirmed both of Warden Bobby's decisions.

The Ohio Administrative Code ("OAC") prohibits dreadlocks. OAC § 5120-9-25(D). According to ODRC regional security administrator Terry Tibbals ("Tibbals"), dreadlocks pose substantial and unacceptable risks to institutional safety and security. These risks include: (1)

2

concealment of weapons, drugs, and other contraband[2]; (2) ability to disguise oneself and evade recognition in the event of an escape; (3) hygiene concerns. Additionally, unlike searches of long hair or beards, staff cannot conduct thorough searches of an inmate's dreadlocks by simply having him run his fingers through his own hair. It is often not possible to see or feel inside a coil of hair that is matted together, and contraband could be hidden within a particularly thick coil of hair. Tibbals further states that having staff close enough to touch an inmate's scalp creates additional security risks of assault by the inmate, creates an inherent tension between the two parties, and exposes staff to the danger of being cut by any weapons potentially hidden in the dreadlocks. Hygiene is also a concern because dreadlocks are often maintained by not washing the hair. Tibbals claims that the prohibition on dreadlocks furthers the prison system's interest in protecting each inmate's health and minimizing tension among inmates and staff stemming from health and hygiene concerns.

The instant claims were filed by Plaintiff pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc, *et seq.* (2000), claiming violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) and various constitutional violations. Based upon the decision of Warden Bobby in 2008 prohibiting dreadlocks, Plaintiff alleges a violation of his right to the free exercise of his religion—namely Rastafarianism—the tenets of which purportedly require uncut dreadlocks to facilitate unfettered communication with the creator, Jah. For purposes of summary judgment, the court assumes the truth of Plaintiff's claim that he had a religious accommodation to grow dreadlocks that was subsequently reversed by Warden Bobby.

---

[2] In the past, ODRC inmates have been caught hiding contraband in dreadlocks and braids.

Defendants, together, have submitted a Motion for Partial Summary Judgment[3] on Plaintiff's uncut dreadlock claims.

## II. Legal Analysis

### A. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party. The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Moreover, Fed. R. Civ. P. 56(e)(2) states:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

---

[3] Defendants have not yet moved for summary judgment on Plaintiff's claims regarding his religious right to a natural foods diet.

In order to survive a motion for summary judgment, the party that bears the burden of proof at trial must establish the essential elements of its case. *Tolton v. Am. Biodyne, Inc*., 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Id.* at 248. Summary judgment should be denied if, based upon the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 258. Accordingly, summary judgment analysis examines whether the trial is necessary, and judgment is appropriate when there are no genuine issues of material fact. *Anderson*, 477 U.S. at 250.

**A. RLUIPA claim**

In pertinent part, the Religious Land Use and Institutionalized Persons Act of 2000, provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Plaintiff, therefore, can establish a violation by proving that the regulations imposed by the prison constitute a "substantial burden" on Plaintiff's religious exercise without promoting a compelling governmental interest that is advanced through the least restrictive means. The Sixth Circuit has looked to the Supreme Court's jurisprudence regarding

5

the Free Exercise clause to determine the scope of RLUIPA's "substantial burden" requirement. *Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729, 733-34 (6th Cir. 2007) (noting that in the context of the Free Exercise Clause, the Supreme Court has made it clear that the hurdle is fact intensive).  In determining whether a prison regulation, for instance, constitutes a "substantial burden," a court must look to whether pressures are imposed on the inmate to significantly modify behavior and violate sincerely held religious beliefs.  *Id.* at 734.

Plaintiff argues that it is his sincerely held religious belief that wearing uncut dreadlocks permits him to communicate better with his creator, Jah.  However, this belief comes into conflict with OAC § 5120-9-25(D), which places restrictions on hair grooming for inmates:

> Haircuts shall be provided as needed.  Hair shall be clean, neatly trimmed, shall not extend over the ears or the shirt collar and shall not protrude more than three inches from the scalp.  Braids may be worn subject to the limitations of this rule.  The following hairstyles or facial hair are not permitted:  Initials, symbols, dyes, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness), weaves, and dreadlocks.  Other hairstyles not specifically listed herein may be prohibited if they are determined to be either a threat to security or contrary to other legitimate penological concerns, as determined by the office of prisons.  If approved by the warden, an inmate may wear a wig for medical reasons or in conjunction with medical treatment.

For purposes of the RLUIPA analysis and viewing the facts in the light most favorable to Plaintiff, the court assumes that the enforcement of the grooming regulation and Defendants' refusal to allow him to grow uncut dreadlocks substantially burdens Plaintiff's religious practice, and that his burdened belief is sincere.  Next, the court must determine whether the decision is the least restrictive means of furthering a compelling governmental interest.

Prison security is clearly a compelling governmental interest.  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005).  The government's interest also extends to security during transport of inmates.  *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997).  Defendants, as prison officials, are entitled to deference with respect to such determinations.  *Cutter*, 544 U.S. at 725 n.13

6

("Prison security is a compelling state interest, and … deference is due to institutional officials' expertise in this area."). Further other circuits have acknowledged this compelling interest in the face of challenges to prison grooming policies. *Hoevenaar v. Lazaroff*, 422 F.3d 366, 366-67 (6th Cir. 2005); *McRae v. Johnson*, 261 Fed.Appx. 554, 558 (4th Cir. 2008).

Defendants in this matter have articulated numerous security-related reasons for the grooming regulation, including the risk of hidden contraband and the risk of harm to officers and inmates in searching dreadlocks, which this Circuit has found to be sufficient justification for prison grooming regulations. *Hoevenaar*, 422 F.3d at 366-67 (upholding grooming code prohibiting long hair in face of RLUIPA claim). Therefore, this court finds that the prison security interests presented by Defendants constitute a compelling governmental interest.

This leaves the issue of whether the grooming regulation is the least restrictive means for achieving these goals. The ODRC grooming code has been upheld in this Circuit as the least restrictive means for promoting prison security. *Id.* at 370-72. Similarly, this court has held that

> Important prison objectives of safety cannot reasonably be maintained without [the grooming] regulation. Alternatives, such as individualized, detailed inspection of dreadlocks would impose dangerous burdens on prison officials and inmates unlikely to ensure the removal of all contraband. "The impact upon prison resources as related to search procedures and the time spent on searching for contraband by staff is a serious consequence of invalidating the grooming regulation and undermines the interest of safety and security."

*Johnson v. Collins*, 2009 WL 1543811, No. 3:07cv211, at *5 (N.D.Ohio, June 2, 2009) (Katz, J.) (citing *Williams v. Wilkinson*, No. 3:91cv7634 (N.D.Ohio, May 16, 1996)). Other circuits have held the same. *McRae*, 261 Fed.Appx. at 559-560 (holding that the prison grooming code was narrowly tailored to further the interest of prison security); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996) (upholding prison ban on dreadlocks longer than below the ears under the Religious Freedom Restoration Act, the precursor to RLUIPA).

The averments of Tibbals in this matter reflect similar concerns. Prison officials cannot search dreadlocks without putting themselves and inmates at risk of physical harm. Even conducting such a search does not guarantee that all contraband will be found. The only available means for officials to ensure that nothing is hidden within dreadlocks is a ban as contained in the grooming policy. Anything less would fall short of achieving institutional security. Further, Tibbals's determinations in this matter are entitled to deference by the court. *Hoevenaar*, 422 F.3d at 370-372. Therefore, the court finds the provision of the grooming regulation prohibiting dreadlocks is the least restrictive means to further the compelling interest of prison security.

**B. Constitutional Claims**

**1. Free Exercise, Equal Protection Claims**

Plaintiff alleges that Defendants' actions are a violation of the Free Exercise and Equal Protection Clauses of the First Amendment of the United States Constitution. In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that when a prison regulation or decision impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests, a standard that is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)). In *Turner*, the Supreme Court set forth four factors for determining whether a prison regulation or decision is reasonably related to the government's penological interests. Those factors are as follows: (1) Whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there still exist for a prisoner alternative means of exercising his rights; (3) the

8

impact of the accommodation of the asserted constitutional right upon guards and other inmates, and upon the allocation of prison resources generally; and (4) whether there is a ready alternative to the prison regulation. *Turner*, 482 U.S. at 89-90.

Defendants have set forth numerous reasons for restricting prisoners' ability to grow dreadlocks, including the safety of officers and other inmates and prevention of the smuggling of contraband. According to Defendants, Plaintiff retains the right to attend services, read holy books and pray, among other observances. While Plaintiff's exercise of his religion may be affected by the ban on dreadlocks, the personnel and inmates at the prison would be at risk of threats to their safety if this ban were not in effect.

This court has already held not only that prison security is a compelling governmental interest and that prison officials are granted deference in their decision-making regarding prison security, but also that dreadlocks pose a specific risk of danger within a prison environment. *Johnson*, 2009 WL 1543811. Further, the *Johnson* court found that the plaintiff "fail[ed] to demonstrate any instances in which other inmates have been permitted to wear dreadlocks, and therefore fail[ed] to raise a genuine issue of material fact regarding equal protection." *Id.* at *6.

The situation is no different here. While Plaintiff has asserted that his religious beliefs are being treated differently from those of inmates who practice other religions, he has not demonstrated that those other inmates grow dreadlocks, which pose a very particular threat within a prison. Further, regardless of whether Plaintiff was at one time granted permission to grow dreadlocks, such a variance from prison regulations does not establish a *right* of the prisoner to wear the dreadlocks in the face of a legitimate governmental interest and a rationally related regulation. That the prison administrators may have revisited that variance and revoked it

9

does not establish a constitutional violation. Plaintiff's free exercise and equal protection claims are without merit.

### 2. Establishment Clause

Plaintiff has also made a passing claim with little factual or legal support that Defendants' actions violate the Establishment Clause of the Constitution. The First Amendment states that "Congress shall make no law respecting the establishment of religion." U.S. CONST. Amend. I. A governmental policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, (3) it fosters an excessive entanglement with religion. *Lemon v. Kurtzman*, 403. U.S. 602, 612-13 (1971).

Plaintiff may be attempting to claim that the prison regulation inhibits his ability to practice his religion. As set forth above, even if this were the case, the restriction is intended to promote prison safety and is clearly rationally related to that objective. This claim is without merit.

### 3. Cruel and Unusual Punishment

Plaintiff has also claimed that Defendants' actions violate his right to be free from cruel and unusual punishment. The United States Supreme Court has held that the Eighth Amendment applies not only to deprivations relating to a sentence, but also to the treatment a prisoner receives in prison and the conditions under which he or she is confined. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). The Eighth Amendment's prohibitions against cruel and unusual punishment restrain prison officials from using excessive force against prisoners. *Id.* at 832 (citing *Hudson v. McMillian*, 503 U.S. 1 (1992). The Amendment also requires prison officials to provide humane conditions of confinement, such as adequate food, clothing, shelter, and medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). According to the

Sixth Circuit, "[o]nly those deprivations denying the 'minimalized measure of life's necessities' may form the basis of an Eighth Amendment violation." *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992)(quoting *Wilson v. Seiter*, 501 U.S. 294 (1991)).

If the court construes the Plaintiff's complaint liberally, he appears to attempt to raise a claim of inhumane conditions. In no way does the ODRC grooming code deny Plaintiff the minimal necessities of life such as food, clothing, shelter or medical care. *Id.*; *Farmer*, 511 U.S. at 832. Accordingly, Plaintiff's Eighth Amendment claim fails.

### C. Qualified Immunity

Defendants claim that they are entitled to qualified immunity in their position as prison officials. Supreme Court precedent "generally provid[es] government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "[T]he burden of proof in qualified immunity cases is on the plaintiffs." *McCloud v. Testa*, 97 F.3d 1536, 1542 (6th Cir. 1996)(citing *Washington v. Newsom*, 977 F.2d 991, 995 (6th Cir. 1992)).

In determining whether a plaintiff has carried that burden, the Sixth Circuit has used a three-pronged analysis. The court must first determine, under applicable law, if a constitutional violation occurred. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). If a constitutional violation exists, the court determines whether it involved "clearly established constitutional rights of which a reasonable person would have known." *Id.* at 1158 (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)). "Once it is determined that the right is clearly established, the court must determine "'whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively

unreasonable in light of [the] clearly established constitutional rights.'" *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (alterations in original)).  Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established constitutional rights. *Dickerson*, 101 F.3d at 1158 (citing *Buckner v. Kilgore*, 36 F.3d 536, 540 (6th Cir. 1994)).

Plaintiff has failed to carry his burden for the first prong of the qualified immunity analysis because he has failed to demonstrate that a constitutional violation has occurred.  The court finds it unnecessary to continue further with the qualified immunity analysis, as summary judgment on the instant claims has been granted.

**III. Conclusion**

For the reasons set forth above, the court finds that Plaintiff has failed to make out claims for constitutional violations or violations under RLUIPA.  Therefore, Defendants' Motion for Partial Summary Judgment is GRANTED.


IT IS SO ORDERED.

DATED:  December 16, 2009          */s/ John R. Adams*_____
                                   Judge John R. Adams
                                   UNITED STATES DISTRICT COURT